2016 PA Super 123

| | | |
|---|---|---|
| D.K.D., | ⁞ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | ⁞ | |
| v. | ⁞ | |
| A.L.C., | ⁞ | |
| Appellee | ⁞ | No. 1276 WDA 2015 |

Appeal from the Order July 31, 2015
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD-09-008227-003

BEFORE:  BOWES, MUNDY AND JENKINS, JJ.

OPINION BY BOWES, J.:                                    **FILED JUNE 15, 2016**

D.K.D. ("Father") appeals from the July 31, 2015 custody order that granted the motion filed by A.L.C. ("Mother") to relocate to Treasure Island, Florida and denied his motion to modify an existing custody order.  We reverse and remand for further proceedings.

Mother and Father married on March 29, 2004, separated during 2009, and divorced in March of 2015.  The family moved to the Pittsburgh area two years into the marriage.  The marital home was in Imperial, Pennsylvania.  Following the separation, Father, who currently works for the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force, moved approximately twelve miles from the marital residence to his parents' home in Burgettstown.  Until Mother moved to Florida during early 2015, she

remained in the marital home with the parties' son L.D., who was born of the marriage during February 2008.

As L.D.'s therapeutic needs weighed heavily on the trial court's custody and relocation decisions, we summarize the relevant facts herein. In June of 2009, L.D.'s pediatrician, Patricia Miller, M.D., identified significant language and speech delays. Subsequent testing revealed a possible Autism Spectrum Disorder, and during January 2011, L.D. was diagnosed with Pervasive Development Disorder, not otherwise specified.[1] He was prescribed thirty hours per week of intense outpatient therapy, most of which was provided in the marital home. Stability and routine are paramount to L.D.'s continued development.

Meanwhile, following the marital breakdown, on July 1, 2009, Father filed a petition for divorce that included a count for custody of L.D. The trial court entered a consent order that granted shared legal custody and awarded Mother primary physical custody. Father received periods of physical custody of L.D. for two hours on Tuesday and Thursday evenings and for three hours on alternating Saturday afternoons. The accord expressly limited the evening custody to the marital residence. While Father was authorized to exercise his custodial rights outside of the home during

_____

[1] Dr. Miller explained that Pervasive Development Disorder is a nonspecific, descriptive diagnosis within the autism spectrum of developmental delays in two or more areas. N.T., 2/19/15, at 94.

Saturday afternoons, in reality, Mother regularly objected to L.D. leaving the home with Father due to her concern that the disruption would be harmful to L.D.'s condition. Father generally acquiesced to Mother's demands and exercised weekend custody at the marital residence.

On September 25, 2014, Father filed a petition to modify the consent order. He sought larger periods of physical custody, more specific vacation and holiday schedules, and better enforcement of his custodial rights. Approximately one month later, Mother countered by issuing notice of her proposed relocation to Ocklawaha, Florida, so that she and L.D. could reside with her mother ("Maternal Grandmother").

Father opposed the proposed relocation, and the trial court held a two-day trial on the parties' respective petitions. Mother and Maternal Grandmother testified in support of the proposed relocation. Father testified on his own behalf and presented Dr. Miller, and his parents ("Paternal Grandparents") as witnesses. Following the testimony and review of the parties' proposed findings of fact, on March 20, 2015, the trial court denied Mother's proposed relocation. The trial court delineated the reasons for its decision, and addressed the ten relocation factors under 23 Pa.C.S. § 5337(h), reproduced *infra*. It found that the only factor that militated in favor of relocation concerned the anticipated enhancement to Mother's quality of life. The remaining factors, including consideration of L.D.'s quality of life, either weighed against relocation, were determined to be

neutral, or were inapplicable. In sum, the court reasoned, "While Mother demonstrated that relocating to Florida would enhance her general quality of life, she failed to meet her burden that relocation is in [L.D.'s] best interest." Findings of Fact, 3/23/05, at 15.

In addition, the trial court granted Father's motion to modify the custody arrangement. It alleviated Mother's precondition that Father exercise custody at the marital home and fashioned a custody schedule that increased Father's periods of physical custody gradually over four months. The expansion culminated with Father exercising overnight custody on alternating weekends from Friday evening until Sunday evening. The court also outlined a defined custody schedule for L.D.'s academic breaks, holidays, and summer vacation.

On April 8, 2015, Mother filed a motion for reconsideration and a motion for special relief. The motion for reconsideration noted that the trial court had not established a custody schedule in the event that Mother elected to relocate to Florida without her son. The concomitant motion for special relief informed the court that, while the court's decision was pending, Mother, who attained a Juris Doctor degree, had accepted a job in Florida as a claims assistant at the Department of Veterans Affairs and had devised an interim plan for Maternal Grandmother to care for L.D. in the marital residence while she began immediate employment. Mother continued that she intended to purchase a home in Florida in anticipation of the trial court's

reconsideration of its denial of her prior petition for relocation. Specifically, she averred, "Mother plans to have a home purchased in the geographic area of her employer in which she and her mother will live, with, if the Court permits, the child." Petition for Special Relief, 4/15/15, at 3. Mother asserted that the employment offer was a significant factor that was not of record during the prior hearing and she contended that "other significant changes have occurred," which she failed to identify in the petition. *Id*. at 2. Mother requested that the court re-open the record to take additional evidence relative to her relocation.

Within the thirty-day period to appeal the March 23, 2015 custody order, the trial court granted Mother's motion to reconsider, reopened the record, and scheduled an evidentiary hearing for June 2015. In light of the court's decision to reopen the record, Father submitted a motion to amend his original petition for modification in order to address Mother's acceptance of employment in Florida. The trial court granted Father's motion to amend. Thereafter, Mother issued an amended notice of relocation proposing to relocate with L.D. to Treasure Island, Florida, approximately two hours away from Maternal Grandmother's home. Again, Father opposed relocation.

On July 1, 2015, the trial court convened a third day of trial to address Father's amended motion for modification and Mother's amended relocation petition. Mother and Maternal Grandmother again testified in favor of relocation. Father and his parents testified in opposition to relocation and in

favor of granting Father primary physical custody of the child in Pennsylvania. On August 3, 2015, the trial court issued amended findings of fact and entered a custody order granting Mother's request to relocate with L.D. to Treasure Island, Florida.

Again, the court delineated its consideration of the § 5337(h) relocation factors and the relevant best-interest factors outlined in 23 Pa.C.S. § 5338(a). As it relates to Mother's amended relocation petition, the trial court determined that factor two, which it had previously determined to weigh against relocation, was now neutral. More importantly, the trial court changed its opinion of the seventh factor regarding the enhancement of L.D.'s quality of life and found that the two factors that supported relocation to Florida, *i.e.*, the enhancement to Mother and L.D.'s respective quality of life, prevailed over the three factors that weighed against relocation: the deleterious effect of relocation on L.D.'s relationship with Father; the feasibility of preserving that relationship considering logistic and financial constraints; and Mother's established pattern of conduct to thwart the growth of the father-son relationship.

In denying Father's petition to modify, the court initially determined that the one best-interest factor in favor of granting Mother primary physical custody, *i.e.*, the party more likely to attend to L.D.'s daily needs,

outweighed the single factor that militated in favor of Father: Mother's lack of cooperation and contribution to the level of conflict.[2]  It found that the remaining best-interest factors either supported both parents equally or were inapplicable.

Father filed a timely appeal and a contemporaneous concise statement of errors complained of on appeal.  He identifies five issues for our review:[3]

> I.    The trial court committed [an] abuse of discretion in its application of 23 Pa.C.S. § 5328.
>
> II.    The trial court committed [an] abuse of discretion in applying the best interest standard in a gender-biased manner.
>
> III.    The trial court erred in finding that the Mother provides more stability for the child in a gender-biased manner.
>
> IV.    The trial court committed [an] abuse of discretion in failing to consider the father-child relationship in awarding primary physical custody to Mother.
>
> V.    The trial court abused its discretion in failing to require Mother to fully meet her burden in determining that the relocation is in the child's best interest.

_____

[2] As it relates to both factors, the trial court determined that the single factor in favor of the respective parent did not weigh significantly against the other parent.  Specifically, the court found that, although Mother was more likely to attend to L.D.'s daily needs, it was confident that Father would satisfy L.D.'s needs if given the opportunity.  Similarly, the court determined that, while Mother's lack of cooperation militated in Father's favor, it anticipated that Mother would be more cooperative and accommodating to Father's requests in the future.

[3] Father lists six issues in his brief; however, he presents argument for only five of those claims.

Father's brief at ii. Mother did not file a brief to level any countervailing arguments.

We review the trial court's custody order for an abuse of discretion. ***S.W.D. v. S.A.R.,*** 96 A.3d 396, 400 (Pa.Super. 2014). We defer to the trial court's factual findings that are supported by the record and its credibility determinations. ***Id***. However, we are not bound by the trial court's deductions or inferences, nor are we constrained to adopt a finding that cannot be sustained with competent evidence. ***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa.Super. 2014). In sum, this Court will accept the trial court's conclusion unless it is tantamount to legal error or unreasonable in light of the factual findings. ***S.W.D., supra*** at 400.

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa.Super. 2006) (*citing* ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa.Super. 2004)).

First, we address Father's complaints that the trial court failed to utilize gender-neutral considerations when addressing the best interest factors under §§ 5328(a) and 5337(h). This discussion subsumes the second and third issues that Father levels in his brief. For the following reasons, both assertions fail.

- 8 -

Father baldly asserts that the trial court's custody/relocation determination was "a glaring example of the gender bias in custody decisions that is not permitted under Pennsylvania case law." Father's brief at 12. He highlights that Pennsylvania abolished the tender years doctrine, which formed a preference in favor of mothers of preschool-aged children, and he notes that when both parents are determined to be competent, equally-shared physical custody is favored.

Father is correct that gender-neutral custody considerations are well ensconced in Pennsylvania jurisprudence, and the Custody Law does not countenance presumptions between parents based upon gender or any other characteristics. *See* 23 Pa.C.S. § 5327(a) ("In any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a particular parent."). However, Father failed to establish either that the trial court was biased against him or that the court fashioned a presumption in Mother's favor.

Father complains that, even though the court recognized his relationship with L.D. and acknowledged Mother's persistent intermeddling with his ability to fully exercise his custody rights, the court nevertheless failed to consider these dynamics in applying the best interest factors or in granting Mother's petition to relocate to Florida. We disagree with Father's characterization of the trial court's analysis. In actuality, the certified record demonstrates that the trial court weighed both the fact that Mother acted as

L.D.'s primary caretaker since birth and the reality that Father's attempts to become more involved in his son's life and shoulder more of the parental burden were frustrated by Mother's overbearing nature, L.D.'s therapeutic needs, and Father's parental shortcomings. The court contemplated each of these facts, which are all supported by the record, along with the other statutory determinations and concluded that it would be in L.D.'s best interest to remain in Mother's primary physical custody and relocate to Florida. While the trial court's custody decision is by no means unassailable, it clearly was not the product of gender-bias or a presumption in contravention of § 5327(a). These claims fail.

As Mother exercised primary physical custody of L.D. from the outset, the trial court's denial of Father's request for primary custody flowed from its decision to permit Mother to relocate to Florida with L.D. Thus, we next address the merits of the trial court's decision to grant Mother's petition for relocation, which Father challenges in the fifth question presented for review.

The Child Custody Law enumerates ten factors a court must consider in determining whether to grant a proposed relocation:

(h) Relocation factors.--In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and

with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).  As the custodial parent seeking to relocate with L.D., Mother had the burden of establishing that relocation is in her son's best interest.  *See* 23 Pa.C.S. § 5337(i) ("**Burden of proof.-** (1) The party

proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h).").

Herein, the trial court initially found that Mother failed to satisfy her burden of proof. However, based upon Mother's motion for reconsideration, the trial court re-opened the record, and revisited the issue in light of Mother's additional evidence that she had obtained employment in Florida earning between $36,000 and $41,000 and that Maternal Grandmother had committed to purchase Mother a $435,000 home in Treasure Island, Florida. Following the third evidentiary hearing, the trial court reversed its course and determined that Mother, in fact, satisfied her burden of proof.

Father challenges the court's determination that Mother established that relocation was in their son's best interest. He argues that while Mother demonstrated that moving to Florida would enhance her general quality of life, she failed to prove that relocation was in L.D.'s best interest under the ten factors listed in § 5337(h). Although Father discusses each of the ten relocation factors individually, mindful that the trial court altered its original perspective of only five factors, we focus on the court's re-consideration of those five points.

Our review concentrates upon the second, third, fifth, sixth, and seventh relocation factors identified in § 5337(h). We discuss the factors

sequentially, and for the reasons expressed *infra*, we find that the trial court's *volte-face* was not supported by the record.

First, relating to factor two, which concerns L.D.'s developmental needs and the likely impact that relocation would have upon his physical, educational, and emotional development, the trial court initially found that this factor weighed against relocation. In essence, the trial court accounted for the various ways that relocation would affect L.D.'s difficulty adjusting to foreign environments and determined that the factor militated against relocation. However, upon review of Mother's new evidence, it relaxed its concerns, and concluded "[t]his factor did not weigh in favor of or against relocation." Findings of Fact, 8/3/15, at 13.

In the March 2015 order denying Mother's petition for relocation, the trial court noted that Mother offered no evidence of L.D.'s proposed health care options in Florida, and observed that it would be difficult for L.D. to adjust to a new school, neighborhood, and friends, and it recognized that the proposed move would disrupt his stability and routine. Findings of Fact, 3/17/15 at 7-10. However, in contrast to the reasoned determination in its March order, the trial court subsequently determined that this factor no longer militated against relocation. In addition to finding that Mother supplemented the record regarding pediatricians and health care facilities near Treasure Island, the Court reasoned that, since Father lived in a different school district from the marital residence, L.D. would have to adjust

- 13 -

to a new school regardless of whether he relocated to Florida or remained with Father in Pennsylvania. The court also noted that, since Pennsylvania and Florida both utilize the academic curriculum known as Common Core, L.D. would find continuity in his education. Thus, upon consideration of Mother's new evidence, the trial court changed its perspective of this factor as supporting relocation.

The trial court's rationale is flawed. Contrary to the trial court's new perspective, the disruption to L.D.'s routine is not inevitable regardless of the proposed relocation. Preliminarily, the trial court discounted Father's commitment to move to the West Allegheny School District so as to not disturb L.D.'s education. Additionally, even to the extent that the trial court was not persuaded by Father's intention to move to accommodate his son, the court failed to acknowledge that, by remaining in Pennsylvania approximately twelve miles from the former marital home, L.D. would preserve routines and friendships by participating in activities that are not specific to the West Allegheny School District, *i.e.*, attending private karate instruction, visiting friend's homes, and enjoying programs at the Carnegie Museum and Carnegie Science Center in Pittsburgh. Moreover, the court neglected to acknowledge that, beyond education, remaining in Pennsylvania would provide L.D. continued access to Dr. Miller and, if needed, the behavioral therapists. Thus, while the trial court initially accounted for L.D.'s difficulty adjusting to a foreign environment, upon reflection, it discounted

those concerns in favor of the new evidence that Mother used to bolster her otherwise deficient petition to relocate.

Likewise, the trial court relaxed its position in relation to factor three concerning the feasibility of preserving L.D.'s relationship with Father. The trial court initially found that, due to logistics, expenses, and travel time, relocation was not feasible to preserve Father's custodial rights. Upon reconsideration, however, the court reasoned that it could conceivably fashion a custody schedule that awarded Father significant periods of custody during holidays and summer vacation in a way that approximated the custodial periods he exercised in the March 2015 order. Nevertheless, in ultimately concluding that this factor weighed against relocation, the court determined that the prospective relocation would impair the existing father-son relationship.

Despite indicating that relocation was unfeasible in addressing this factor, in reality the trial court not only sustained the feasibility of this type of arrangement, but it crafted a post-relocation custody schedule that employed the deficient approach. Father was awarded alternating weekend custody **in Florida**, one week of custody during L.D.'s winter and spring breaks, and a maximum of four consecutive weeks of custody during L.D.'s summer break. Hence, in facilitating Mother's relocation to Florida, the court utilized the identical scheme that it explicitly found "would not be feasible . . . to preserve [Father's] existing relationship with L.D." ***See***

- 15 -

Findings of Fact, 8/3/15, at 14. In doing so, the trial court overlooked evidence that Father's position with the FBI Joint Terrorism Task Force restricted his availability during major holidays. Thus, the trial court cannot cure the substantial disparity in custody following relocation simply by amassing the majority of Father's custodial periods during Christmas, Easter, and summer vacation.

Moreover, concerning factor five, in granting Mother's petition for relocation in derogation of Father's custodial rights, the trial court disregarded its express finding that "Mother historically refused to grant father's requests to spend additional time with [L.D.] or permit overnight physical custody between Father and [L.D.]" and discounted its observation that "[t]his conduct has had the effect of stalling the development of [L.D.'s] relationship with his Father." *Id*. at 15. The court also noted that when Mother began her employment in Florida, she elected to have Maternal Grandmother move to Pennsylvania to care for L.D. rather than increase Father's parental role. However, notwithstanding record evidence of Mother's ensconced pattern of thwarting Father's relationship with L.D., the trial court diminished Mother's actions, ostensibly in favor of the ambitious, but unsupported, belief that Mother would be more cooperative now that she succeeded in relocating to Florida. We disagree with the court's rationale. Concisely put, Mother's proposal that Father visit their son in Florida, presumably pursuant to her terms and conditions, do not negate the

cumulative effects of her campaign of interference with Father's custodial rights.

In addition to weakening its opposition to relocation under factors two, three, and five, the trial court became even more resolute in favor of relocation under factors six and seven concerning whether relocation would enhance the respective quality of life of Mother and L.D. In relation to Mother, the trial court initially concluded that the then-proposed relocation to Ocklawaha, Florida, to reside rent-free with Maternal Grandmother would enhance Mother's financial and emotional outlook. Recall that Mother, who had not yet obtained employment in Florida, intended to purchase a home in Ocklawaha with the proceeds from the sale of the marital residence and utilize Maternal Grandmother for childcare. The court determined that this factor in Mother's favor was insufficient to warrant relocation.

Upon reconsideration of Mother's petition to relocate, however, the trial court shifted its focus to the improvements to Mother's quality of life that flowed from her newly acquired employment. Specifically, the court highlighted that Mother would earn approximately $36,000-$41,000 per year, albeit in an entry-level clerical position outside of her professional training. The court stressed that, "[d]espite significant efforts, Mother has been unable to obtain employment in Pennsylvania" and that this opportunity permitted Mother to retain approximately three years of seniority that she accrued in the federal employment system. *Id*. at 16.

The court revisited the putative significance of Mother's commitment to sell the marital residence regardless of relocation and underscored the fact that Maternal Grandmother purchased Mother a $435,000 home in Treasure Island, with the promise that Mother would repay some of that debt with the proceeds from the sale of the marital residence. The trial court surmised, "Emotionally, Mother will enjoy independence and financial freedom resulting from finding gainful employment and new housing." *Id*. It concluded that her access to family and the opportunity for a fresh start would benefit her emotionally and financially.

The trial court's characterization of the benefits that will inure to Mother as a result of relocation distorts the evidence that Mother presented during the July 1, 2015 hearing. As discussed below, 1) Mother failed to pursue career opportunities in Pennsylvania that were commensurate to her education and training; 2) while Mother claimed that she could not afford to remain in the marital home, she acquired a residence in Florida for more than three times the amount that she owed on the marital property; and 3) the emotional support that Mother would ostensibly gain from Maternal Grandmother's presence is significantly diminished by the fact that Mother's new home is in excess of two hours away from Maternal Grandmother's residence.

First, we address Mother's search for employment. Stated plainly, Mother possessed a strong desire to return to Florida and prior to the third

relocation hearing, she listed the marital home for sale because, having accepted employment, she had **no** intention to continue living in Pennsylvania. N.T., 7/1/15, at 54, 103. She explained, "I listed it for sale because I need to sell it and have the proceeds financially. I'm not going to live there anymore. I have taken a job and it's not in the Pittsburgh area." *Id*. at 54. Mother's evidence established that she has been looking earnestly for employment in Florida since July 2012, approximately two years before she issued notice of her intention to relocate. Mother initially sought to relocate with L.D. to that state without any job prospects, and while Mother included Pennsylvania and Washington, D.C. within the parameters of her USAJOBS[4] employment searches, she was committed to finding employment in Florida, even if the career opportunity was outside of her profession and paid substantially less than what she could earn in the legal field. In fact, Mother acquired the clerical position that forms the basis of the court's revised "quality of life" rationale through USAJOBS, having submitted her application for that position on January 15, 2015.

Mother defended the scope and nature of her pursuit of employment by explaining that Pittsburgh does not offer many opportunities for federal

---

[4] USAJOBS is a website administered by the United States Office of Personnel Management. It compiles the federal government's official list of employment opportunities and permits users to apply to numerous positions *en masse* and track the status of those applications.

employment. However, in light of the deleterious effect that her employment preferences had upon the father-son relationship, Mother's preoccupation with the benefits flowing from three years seniority in the federal employment system is patently unwarranted. Exhibit K, which the trial court cites for its proposition that Mother performed an exhaustive job search in Pennsylvania, reveals that since 2012 Mother applied to approximately eight hundred federal employment opportunities via the USAJOBS website, predominately for positions located in Florida. Despite Mother's legal background, she submitted applications for an assortment of careers ranging from a park guide in Ochopee, Florida (Big Cypress National Reserve) to a cemetery representative in Arlington, Virginia (Arlington National Cemetery). Her less eclectic submissions included, *inter alia*, applications for various low-level clerical jobs and non-attorney legal positions in Washington, D.C. and Pennsylvania, but again, principally in Florida. Indeed, in complete contrast to the trial court's perspective of Mother's diligence, Mother neglected to adduce any evidence of a focused employment search beyond her obvious emphasis on seeking federal career opportunities in Florida.

Additionally, although Mother referenced an additional one hundred applications during her testimony, she did not present evidence of any job searches beyond the USAJOBS printouts identified as Exhibit K. More importantly, Mother did not testify that any of the other undocumented jobs

were in Pittsburgh. In fact, the record reveals that Mother did not apply for any private sector jobs in the Pittsburgh area. Thus, notwithstanding the trial court's reliance upon Exhibit K as evidence of Mother's inability to secure gainful employment in Pennsylvania, our review of the certified record confirms that the vast majority of the job opportunities that Mother pursued in the two years preceding her motion for relocation were located in Florida. If anything, the evidence of record supports the contrary finding that Mother neglected to make a sincere, unencumbered effort to find employment in Pennsylvania or, as we discuss *infra*, maintain the marital residence to avoid removing L.D. from his stable environment and steady routine.

In addition to relying upon faulty evidence regarding Mother's career opportunities, the trial court misconstrued evidence concerning her financial wherewithal. The court was persuaded by Mother's apparent struggle to maintain the marital residence in Imperial. The record belies the court's inference that Mother is in dire economic straits.

The record establishes that Father pays Mother $1,300 per month alimony and an equal amount in child support. While the alimony is scheduled to terminate during summer 2016, at the time of the third relocation hearing, Mother anticipated receiving an additional $20,000 pursuant to the marital settlement. In addition to the cash receipts, Mother has approximately $190,000 equity in the former marital home in Imperial,

which she listed for $290,000. In addition, she owns a furnished one-bedroom condominium in Tampa, Florida. That property will produce rental income now that Mother purchased a new $435,000 home in Treasure Island.

Notwithstanding these assets, Mother insinuated that her financial situation was so untenable that she and L.D. were on the verge of forfeiting the marital residence. In reality, however, and in contrast to the trial court's supposition regarding her economic distress, Mother adduced scant evidence of economic hardship. In point of fact, the evidence that Mother introduced during the relocation hearing established the inverse conclusion that her finances were sufficiently stable to permit her to focus her employment search upon random lower-level jobs in Florida rather than career opportunities that were suited to her advanced education, experience, and professional training. Additionally, Mother had sufficient means such that she agreed to forego the $20,000 payment so long as Father used it to defer the cost of traveling to Florida several times per year.

Moreover, while Mother has certainly benefited from Maternal Grandmother's largess, if Mother truly desired to attain financial independence and stability for her and L.D., she would have placed greater importance on the value of the potential career opportunities and less emphasis on returning to Florida or utilizing the three years of seniority she accrued in the federal employment system. There is no evidence that

Mother requested that Grandmother redirect the financial resources that she used to purchase the $435,000 home so that Mother could satisfy the $100,000 balance on the marital residence or buy a less expensive home in Pennsylvania. In actuality, Mother was determined to move to Florida and she purposefully directed all of her available resources toward opportunities in that state.

Finally, as it relates to the benefit of emotional support, the record reveals that no such network exists for Mother and L.D. in Tampa. Maternal Grandmother, whose presumed assistance was the initial impetus for relocation to Florida, lives approximately two hours away from Mother. Moreover, Maternal Grandmother is the primary caretaker for her disabled brother with whom she lives. Hence, despite Mother's initial justification for relocation, Maternal Grandmother cannot provide childcare on a daily basis.

Likewise, Mother's attempt to invoke L.D.'s paternal family was unsubstantiated. The record confirms that Paternal Grandparents maintain a seasonal home approximately one-hour away from Mother's new residence, but they spend the majority of the calendar year in Pennsylvania, about twelve miles from the family home in Imperial. In sum, the only relatives that live in the area are the paternal aunt, uncle, and cousins. While Mother testified that she believed it was important for L.D. to fashion bonds with his cousins, once again, scant evidence exists to sustain the conclusion that she would rely upon Father's brother as a support network if the need were to

arise. Recall that Mother previously declined to rely upon Father or his parents, who lived twelve miles from the marital home, to care for L.D. when Mother traveled to Florida to begin employment. She did not inform Father of her travels, and when Father requested additional custody in her absence, she refused. Instead, she summoned Maternal Grandmother from Florida to care for L.D. while she was away. Nothing in the record substantiates the trial court's finding that Mother would engage Father or utilize his family as L.D.'s emotional support network now that she has even greater control over the child approximately 1053 miles away from Pennsylvania.

Notwithstanding the trial court's misapprehension of the foregoing facts, the record supports the contrary conclusion that, despite her indicated dedication to L.D., Mother's primary commitment has been to return to Florida regardless of the trial court's decision. In contrast to Mother's avowed concern for L.D., Mother's actions confirm that her desire to return to Florida, rather than realize L.D.'s best interest, is her paramount consideration. Mother never indicated that she considered redoubling her efforts to find employment in Pennsylvania, either to maintain stability for her son or, if the the trial court denied the petition to relocate, to maintain primary custody. Tellingly, she displayed little reluctance to leave L.D. in Pennsylvania in order to relocate to Florida, and complained that, in denying her initial petition, the court neglected to fashion a custody schedule in the

event that she went to Florida without L.D. Rather than intensifying her efforts in Pennsylvania after the trial court denied her motion to relocate, Mother cultivated roots in Florida in derogation of the trial court order. She accepted a job in Florida, purchased a new home, listed the marital residence for sale, and then requested the court to reconsider its denial based on the "new" evidence. Mother's actions expose her insincerity.

Finally, we address the evidence that the trial court relied upon in concluding that the seventh factor, regarding L.D.'s quality of life, militated in favor of relocation. Initially, the court determined that, despite the obvious advantage of outdoor activities available in Florida, Mother failed to satisfy her burden of proving that relocation would benefit L.D. financially, emotionally, or educationally. The court stressed that L.D. attended a quality school district in Pennsylvania and benefited from the stability and consistency that he achieved by continuing with Pittsburgh-area activities and maintaining his then-current relationships. Hence, the trial court previously found that this factor did not favor relocation.

Upon reconsideration, however, the trial determined that the factor did, in fact, favor relocation. As we noted *supra*, in our discussion regarding L.D.'s developmental needs, the court reasoned that, since Mother was selling the marital residence, L.D. would face disruption and instability in his education and activities even if it denied the petition to relocate. It further found that the elementary school in which Mother proposed to enroll L.D.

was superior to the elementary school he would attend in Burgettstown. Borrowing from the preceding analysis, the court also determined that the benefits of Mother's employment and her purchase of a fashionable home would inure to his advantage. However, for the reasons we previously stated, the trial court abused its discretion in determining that these isolated considerations warranted its decision to reverse its prior position and to grant Mother's petition to relocate.

In sum, the trial court not only discounted Father's commitment to move to the West Allegheny School District, but it also ignored both the ease of maintaining friendships from Burgettstown and the fact that L.D. participates in cultural, educational, and athletic activities in the Pittsburgh area that are specific to neither Imperial nor the West Allegheny School District. Thus, contrary to the trial court's assessment, the record bears out that remaining in the Pittsburgh region would limit the disruptions to L.D.'s routines, friendships, and existing athletic and cultural activities. Hence, the trial court erred in concluding that, regardless of location, the disruption of L.D.'s stability and routine was a *fait accompli*.

For all of the foregoing reasons, the record will not sustain the trial court's consideration of the § 5337(h) relocation factors. Specifically, the trial court erred in (1) finding that Mother would not further thwart Father's relationship with L.D. following relocation; (2) ignoring that Mother's principal motivation was to return to her native state of Florida and her

concern for L.D.'s developmental condition was secondary; (3) accepting as adequate, Mother's chiefly symbolic search for employment opportunities in Pennsylvania; and (4) concluding that Mother's financial condition was so strained that relocation to Florida was unavoidable. The foregoing errors implicate five of the ten factors listed in 23 Pa.C.S. § 5337(h)(2), (3), (5), (6), and (7). Collectively, these errors warrant reversing the trial court's decision to grant Mother's petition for relocation. As the trial court's conclusions are unreasonable as shown by the evidence of record, we cannot accept the court's conclusion that relocation is in L.D.'s best interest.

Mindful that the trial court's denial of Father's request for primary custody was premised upon L.D.'s relocation to Florida with Mother, we reverse the July 31, 2015 order that granted Mother's petition to relocate to Florida and denied Father's amended petition to modify custody and award him primary physical custody. As our determination disturbs the overall scheme of the trial court's custody arrangement, we direct the court to fashion an appropriate custody order that accounts for L.D.'s return to Pennsylvania in Father's primary custody. If Mother seeks to retain primary custody of her son in Pennsylvania, she must file a petition for modification pursuant to § 5338(a) and the trial court will render a custody determination utilizing the § 5328(a) best-interest factors in light of the then-existing circumstances.

Order reversed. Matter remanded with directions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2016