J-A15042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| E.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.B. | : | |
| | : | |
| Appellant | : | No. 3 WDA 2023 |

Appeal from the Order Entered December 7, 2022
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD 18-009151-002

BEFORE:  MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED: AUGUST 15, 2023**

M.B. (Mother) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) granting E.B. (Father) shared physical custody of their son E.B. and daughter A.B. (Children).[1]  We affirm in part and vacate and remand in part.

**I.**

The parties were married in 2004 and E.B. was born in 2010 and A.B. was born in 2013.  During their marriage, they resided in Ross Township in the North Hills of Pittsburgh and Mother continues to live in the marital

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] While neither party has requested that they be identified in the caption by their initials due to the sensitive nature of this custody matter, we will use their initials in the caption as well other involved individuals.

residence. Since April 2021, Father has resided in a home owned by his paramour, T.C., in Mt. Lebanon, in the South Hills of Pittsburgh. T.C. has a son approximately one year younger than A.B. who resides in her home. Father is currently a teacher at a charter high school, while Mother is the executive director of a non-profit organization working with youth.

The parties separated in July 2018 and Father filed a complaint in divorce in October 2018 which was granted on February 6, 2019. Pursuant to a 2018 marital settlement agreement (MSA), Father had custody of Children every Wednesday and Thursday evening and every other weekend from Friday evening until Monday morning. In March 2020, at the onset of the Covid-19 pandemic, the parties shifted to a shared 2-2-3 alternating weekly custody schedule. In early October 2020, the parties reverted to the MSA custody schedule at Mother's insistence.

On October 28, 2020, Father filed a custody complaint seeking to return to the shared physical custody arrangement that the parties experimented with during the pandemic. On February 8, 2021, Mother filed a counterclaim for primary physical custody and shared legal custody.

At the hearing, Father, T.C., Mother and Neil Rosenbaum, Ph.D., a clinical psychologist who was appointed by the court to perform a custody evaluation, testified. Father testified that his current home with T.C. is 10.9 miles or approximately a 20-minute drive to Mother's home and to Children's school in the North Hills School District. N.T., 5/10/22, at 7, 9, 61. Father

explained that on Wednesday and Thursday evenings when he currently has the Children, he ensures that they do their homework, although occasionally it will not be completed in the three hours when he has them on those evenings. *Id.* at 10-11.

Father described the custody arrangement during the early portion of the Covid-19 pandemic and stated his request to avoid further disruption of their relationship. *Id.* at 23. He stated that the Children were "happy" and adjusting "[w]onderful[ly]" to the new routine, with "some kinks to work out," such as virtual learning issues and scheduled routines. *Id.* at 24. When hybrid school resumed in the fall of 2020, he attempted to negotiate a new arrangement with Mother and their co-parenting therapist, but Mother was resistant to any changes and requested that they revert to the MSA schedule and that he reluctantly agreed to avoid conflict with Mother. *Id.* at 15-22.

Father went on to testify that that he and Mother have a "[f]raught" relationship because they are in court, but overall they have "done a pretty fabulous job with co-parenting" Children. *Id.* at 37. Father said that he has been working on the anger issue that Mother raised with him during couples counseling by seeing a therapist and discussing the perception of his intense, loud personality by various individuals in his life. *Id.* at 56-59. Father testified that he went through a brief period during the separation when he was living with Mother when he was drinking too much alcohol but stated he was not an alcoholic. *Id.* at 62-63.

Father stated that Children have dealt with the current parenting situation during litigation well, with minor confusion regarding why they cannot stay with Father on certain nights or why Mother and Father have a disagreement. *Id.* at 38-40. Father explained that he is dealing with A.B.'s anxiety by preparing a checklist for morning school preparation, and that he also has attempted to tone down his own interactions with A.B. when in the past he may have been more voluble. *Id.* at 43-45, 59-61.

Father stated that Children get along excellently with his partner, T.C., as well as her son, who they refer to as their brother. *Id.* at 61-62. T.C. generally drives Children to school on the mornings he has them as she has a more flexible schedule. *Id.* at 46-47. Father intends to take E.B. to school when he starts middle school in the 2022-2023 school year as that school has an earlier start time, while T.C. will continue to take A.B. to school. *Id.* at 48. School pick-up would be shared between Father and T.C. *Id.* at 47, 61.

T.C. testified that she and Father had been in a committed relationship for over two years and planned to marry at some point, even though they were not engaged. *Id.* at 77. She described the morning and afternoon school drop-offs and pick-ups and explained that her work schedule is flexible such that it allows her to accommodate flexible pick-up times. *Id.* at 78, 80-81. T.C. said that Children and her son "get along incredibly well" and that her son and A.B. are "extremely close." *Id.* at 79. T.C. stated that the

blended family functions very well together and that Children and her son have been very happy together. *Id.* at 81.

Mother testified that she works at a fully remote organization, allowing her flexibility to set her schedule, volunteer at school, be available for drop-offs and pick-ups and taking Children to their doctor's appointments. *Id.* at 96-97. In August 2020, she agreed during the Covid-19 pandemic to try allowing Father to have overnights with Children during the school week after discussion with the co-parenting therapist. *Id.* at 100-02. There was a disagreement in October 2020 regarding whether to continue, and Mother requested that they return to the MSA schedule; she stated that she had noticed that Children were reverting to earlier anxious behaviors after overnights with Father, including not sleeping through the night, having bad dreams and becoming emotional very easily. *Id.* at 102-04. Rather than tapering off, Mother noted that the behavior was becoming more frequent as the trial period continued. *Id.* at 105. Furthermore, Children were regularly unprepared for school during the period when Father would drop them off at school such that they could not participate in certain activities. *Id.* at 157-60.

Mother described Father's anger issues as "abuse," explaining that Children had "witnessed him yelling at me, berating me, cursing at me, and throwing things across the home or towards me." *Id.* at 107. Father also threatened to hurt him or her on one occasion during the marriage, forcing

Mother to remove Children from the house for a night. *Id.* Mother stated that Father's alcohol use played a role in his rage outbursts, with Father sometimes flying off the handle with her or Children over minor issues during periods when he was drinking. *Id.* at 110-11.

Mother stated that a shared physical custody schedule was a "lose, lose, lose" situation for Children because all of their activities were in the North Hills, Children's school and activities schedules often did not line up, and Father/T.C., as well as the Children, would have to often make three trips from Mt. Lebanon and back during the day (school drop-off, school pick-up and evening activities). *Id.* at 115-19. Mother denied that the trip would take 20 minutes as Father said, insisting that she tracked E.B.'s phone location showing the trip taking as much as 54 minutes. *Id.* at 120-21, 183.

Mother contrasted her house, which she described as Children's "home base," as contrasted with Father's living situation where he lived in an apartment, his aunt's house, stayed with a prior girlfriend on occasions and now has moved in with T.C. *Id.* at 123-25. She also contrasted her organized parenting style with Father's more "sporadic, impulsive, and playful" style. *Id.* at 125-27. As an example, Mother described Father as being inconsistent in tracking Children's completion of homework assignments, requiring Mother's follow-up to have Children either verify completion or finish the assignments which were not done several times a month on Father's watch. *Id.* at 134-38, 140-48, 160-63. Mother said that Father was often late

arriving for drop-off and pick-up and did not always pick Children up at the designated locations. *Id.* at 149-56. According to Mother, Father also has not taken the lead on any of Children's medical appointments and needs. *Id.* at 179.

Finally, Mother called Dr. Rosenbaum, the court-appointed custody evaluator, to testify. Dr. Rosenbaum completed a psychological evaluation in this case on July 31, 2021, after interviewing each member of the family over the preceding few months and speaking to Children's therapist and the parties' co-parenting therapist. N.T., 5/11/22, at 205-06, 216-18. He testified that both Mother and Father were excellent parents but had different parenting styles. *Id.* at 227.

Dr. Rosenbaum described Father as having a more fluid history that may not lend itself to the stability Children need, citing the numerous colleges, jobs and residences after the divorce. *Id.* at 210-13. On psychological testing, Father scored high on anger control, acting out, impulse control and mania, but these scores were not statistically significant. *Id.* at 220-24. (Mother had elevated scores for defensiveness, inhibition of aggression and denial of social anxiety. *Id.* at 255-59.) On the other hand, Dr. Rosenbaum described Father's strengths as being upbeat, validating Children and being affectionate and loving towards them. *Id.* at 219-20.

Dr. Rosenbaum related Mother's complaints regarding Father's anger issues and specifically how it would affect A.B., who "is more sensitive and

cautious." *Id.* at 206-09. He opined that A.B. is "a little more scattered and forgets things," and she gets more support from Mother in that respect, whereas Father is more upbeat and playful but lacks focus on the details of the tasks necessary for the day-in and day-out preparation for school. *Id.* at 209-10, 220. Dr. Rosenbaum explained that the 2020 shared custody experiment "was very difficult and stressful for" A.B. with episodes of Father yelling and A.B. crying, often related to the process of getting ready for school. *Id.* at 215-18.

Regarding the proposed custody change, Dr. Rosenbaum did not believe that shared physical custody during the school year would be beneficial to Children "at this time," although it would potentially work when Children were older and more mature. *Id.* at 225-26. He noted that Father's estimate of drive time from his residence to school was 15 to 20 minutes, while Mother thinks that in rush hour, it is more like 30 to 45 minutes, which he stated he believed was more realistic. *Id.* at. 210. During the summer, Dr. Rosenbaum believed that a shared custody schedule would be beneficial. *Id.* at 227-28. In addition to the factors discussed above, Dr. Rosenbaum also noted Father's issue of not being available for the Children in the morning as he started work early himself and Children's ability to finish homework in the evening because of the extra driving time. *Id.* at 234-38. He also stated that if Father lived closer to Mother, the proposed shared custody arrangement would not be so much of an issue. He also stated that it was the Children that wanted the

overnights to not continue because Father was giving them a "pep talk about that" but not "pressuring them or brainwashing them" to say so but because they have so much fun at Father's residence sometimes to the detriment of their responsibilities. *Id.* at 243.

At the conclusion of the custody trial on May 11, 2022, the trial court placed on the record its assessment of the Section 5328(a) custody factors[2]

---

[2] The Child Custody Act, 23 Pa.C.S. §§ 5321-5340, requires a trial court to consider all the Section 5328(a) 16 best interest factors when "ordering any form of custody." 23 Pa.C.S. § 5328(a). Those factors are: (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party; (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.(2.1). The information set forth in Section 5329.1(a) (relating to consideration of child abuse and involvement with protective services); (3) The parental duties performed by each party on behalf of the child; (4) The need for stability and continuity in the child's education, family life and community life; (5) The availability of extended family; (6) The child's sibling relationships; (7) The well-reasoned preference of the child, based on the child's maturity and judgment; (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm; (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs; (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child; (11) The proximity of the residences of the parties; (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements; (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party; (14) The history of drug or alcohol abuse of a party or member of a party's household; (15) The mental and physical condition of a party or member of a party's household; (16) Any other relevant factor.
*(Footnote Continued Next Page)*

but did not rule on the custody claims. In making those assessments, the trial court found that neither party was favored with respect to factors 1 (encouraging child's contact with other party), 3 (performance of parental duties), 6 (sibling relationships), 7 (preference of children), 8 (attempts by parent to turn child against other parent), 9 (loving, stable, consistent, nurturing relationship with children), 11 (proximity of parents' residences), 12 (care and making child-care arrangements), 13 (conflict between parties and cooperation), 14 (drug or alcohol abuse) and 15 (mental and physical condition of parents or members of household).

The court found that factors 2 (present and past abuse), 4 (need for stability for children) and 10 (attending to daily physical, emotional, developmental, educational and special needs) slightly favor Mother. The court found that factor 5 (availability of extended family) slightly favors Father. With respect to factor 16 (any other relevant factor), the court noted that Dr. Rosenbaum relied on the input of Children's therapist and the co-parenting therapist and determined that shared physical custody was

_____

A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." ***S.W.D. v. S.A.R.***, 96 A.3d 396, 401 (Pa. Super. 2014). ***See also*** 23 Pa.C.S. § 5323(a), (d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 336 (Pa. Super. 2013).

appropriate in the summers, and that there were only minor roadblocks to it being appropriate during the school year, such as the distance between Father's home and the school and his schedule. N.T., 5/11/22, at 293-319; Trial Court Opinion, 12/7/22, at 2-8 (unnumbered). The trial court also determined that the drive from Father's residence to the school was approximately 18 minutes. *Id.* at 390.

While it addressed the factors at the end of the May 11, 2022 hearing, in the trial court's December 7, 2022 order, it granted Mother and Father shared legal and physical custody. Mother was to have custody from Monday afternoon to Wednesday morning, Father was to have custody from Wednesday afternoon until Friday morning, and the parents would alternate weekends. Also relevant here, without analysis, the trial court also adopted Father's proposed custody order with respect to custody exchanges and the holiday schedule, thus deviating from the previous arrangement set forth in the MSA. Order, 12/7/22, at 1-4 (unnumbered). In accompanying opinion, it reiterated the assessment of the factors it made on May 12, 2022.

Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal as required by Pa.R.A.P. 1925(a)(2)(i). The trial court filed an opinion on February 3, 2023.[3]

_____

[3] Our standard of review is as follows:

*(Footnote Continued Next Page)*

- 11 -

## II.

Mother first contends that the trial court committed an abuse of discretion because its December 7, 2022 order imposing a new custody arrangement violated Pa.R.Civ.P. 1915.4(d) requirement that a decision be issued within 15 days, but that "[i]n no event" shall it be delayed more than 45 days[4] having been issued on December 7, 2022, approximately six months

_____

> In reviewing a custody order, our scope is of the broadest type and our standard is an abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Graves v. Graves*, 265 A.3d 688, 693 (Pa. Super. 2021) (citation omitted). The paramount concern in any child custody case is the best interests of the child. *D.K. v. S.P.K.*, 102 A.3d 467, 474 (Pa. Super. 2014). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *D.K.D. v. A.L.C.*, 141 A.3d 566, 572 (Pa. Super. 2016) (citation omitted). "In a dispute between parents, each parent shares the burden of proving, by a preponderance of the evidence, that an award of custody to him or her would serve the best interests of the child." *Graves*, 265 A.3d at 698 (citation omitted).

[4] The full text reads: "(d) Prompt Decisions. The judge's decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an
*(Footnote Continued Next Page)*

after the May 11-12, 2022 custody hearing. Mother contends that the trial court's reasoning in its Pa.R.A.P. 1925(a) opinion that the court "announced its decision on the record at the conclusion of trial," TCO at 3, was erroneous because the trial court only reviewed the custody factors but did not give any indication of the final outcome, and because only one of the factors was in favor of Father made it impossible to predict at the end of the hearing that the court would rule for Father.

We decline to vacate the order because of a violation of Pa.R.Civ.P. 1915.4(d)'s time requirement because it does not provide a remedy or any other sanction if the trial court does not comply with its time limits. Rather, the Rule serves an instruction to the trial court to issue a decision in a custody matter within the prescribed time, and if a timely decision is not issued, it allows either party to petition the trial court, reminding it that its decision is overdue, and if an opinion is not then issued, to petition our Supreme Court for relief. In this case, Mother did not seek relief from the trial court once the decision became due or take any other action to seek a timely order. If we were to hold that a party had to take no action if the time periods were not followed, a party could wait until a decision is issued and, if adverse, appeal

_____

extension delay the entry of the court's decision more than 45 days after the conclusion of trial." Pa.R.Civ.P. 1915.4(d); **see also** Pa.R.Civ.P. 1915.4, Comment (noting that "the interests of children who are the subjects of custody litigation would best be served by a requirement that the litigation be concluded within specific time frames").

seeking the order be vacated based solely because the Rule's time limits were not followed.

**III.**

Mother next contends that the trial court did not appropriately address the best interests of Children in its decision to award Father shared physical custody and urges us to reverse for several reasons.

First, Mother contends that the trial court's decision is at variance with its Section 5328(a) finding in that it only found one factor (No. 5 – availability of extended family) favoring Father while three were found in her favor (No. 2 – present and past abuse, No. 4 – need for stability for children, and No. 10 – attending to daily physical, emotional, developmental, educational and special needs of Children). Mother highlights Factor 11 (the proximity of the parties' residences) which the trial court found to be neutral despite the court's discussion in its discussion of Factor 16 (other relevant factors) of Dr. Rosenbaum's serious reservations about whether a 50/50 split of custody during the school year would be in Children's interests. N.T., 5/11/22, at 316-18. In summary, Mother contends that the trial court abused its discretion by issuing a shared custody order requiring longer school commutes to school, less stability in their homes and educational lives, as well as more time spent with Father who the court found slightly less able to meet their daily needs.

However, a custody factor analysis is not a mere tallying of points as to how many factors favored each parent. We review a custody determination

for an abuse of discretion and will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." ***In re K.D.***, 144 A.3d 145, 151 (Pa. Super. 2016); ***Id.*** (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." ***Id.*** In this case, the custody factors assessments only slightly favored Mother making them not compelling in the custody determination. While Dr Rosenbaum found that during the school year there should not be shared custody, he opined that Mother and Father were each an excellent parent. Nothing in those assessments alone would make it an abuse of discretion for the trial court to award shared physical custody.

Second, Mother asserts that the court's analysis focuses on the parties' burden in making the drive from the South Hills to the North Hills and back, without not accounting for how the time spent traveling and shared overnight custody on school nights will serve the best interests of Children. This is the central issue in this case because even Dr. Rosenbaum testified that if Father lived closer to Mother, shared physical custody during the school year would not be an issue. Despite being the central issue, neither Child testified at the hearing how they were affected by the commute.

We note, though, that Dr. Rosenbaum used Mother's estimate of travel time of 35 to 45 minutes while the trial court found the travel time to be 18 minutes. Dr. Rosenbaum testified that the commute for A.B. was difficult because of the distance between Father's residence and the school and she became anxious. It was noted that Father now employed a checklist that was to be followed before A.B. left for school which would hopefully lessen her anxiety. However, as previously noted, Children, when visiting Father on a school night, indicated that they did not want to stay overnight. Accordingly, the trial court's finding that travel time from Father's residence to Children's school was not a sufficient reason to deny joint custody is not an abuse of discretion.[5]

_____

[5] Mother also contends that the trial court mischaracterized and disregarded Dr. Rosenbaum's expert opinions and otherwise is not based upon competent evidence. **M.A.T. v. G.S.T**., 989 A.2d 11, 20 (Pa. Super. 2010) (*en banc*) ("while a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record."). However, the trial court did address Dr. Rosenbaum's opinion and provided a basis for its reasoning in disagreeing with his recommendation. As mentioned, Dr. Rosenbaum's position against Father's shared physical custody during the school year was based primarily upon the time Children would spend traveling from Father's house to the school and activities. The trial court discounted that position by finding that the actual travel time was more in line with Father and his paramour's testimony. In addition, Dr. Rosenbaum's cross-examination showed that Father was not deficient in addressing A.B.'s anxiety, as two incidents in which she reported stomach distress to her school nurse after overnight visits with Father early in the 2021-2022 school year did not continue through the remainder of his custodial school mornings.

Accordingly, because the trial court's decision is based upon a full analysis of the custody factors and is supported by competent evidence, the trial court did not abuse its discretion by awarding joint custody.

**IV.**

Finally, Mother contends that the trial court erred as a matter of law and abused its discretion by deviating from the status-quo for custody exchanges and holiday custody without any comment, analysis or reasoning as to why these changes would be in the best interests of the Children. Mother contends that the parties established a carefully agreed-upon custody agreement in the MSA, including a detailed holiday and summer vacation schedule and a custody exchange protocol, and yet the court completely disregarded the status quo arrangement and adopted Father's proposed order as to these issues without a scintilla of explanation as to why the established practice should be disregarded or how the new provisions better serve Children's best interest. As Mother notes, there was no testimony from Father or otherwise as to why his new proposed custody exchange and holiday schedule would be better for Children. Mother highlights changes such as the parties now having to be responsible equally for transportation costs, which Father was uniquely responsible for before, and each party being able to block out 20 vacation days during the summer, which could effectively allow one party to monopolize Children's whole summer. Order, 12/7/22, at 2, 4. Mother notes that she

submitted her own proposed order, which would have preserved the status quo of the MSA.

While the court did not need to run through an analysis of the Section 5328(a) factors in determining custody exchanges, holiday custody and vacation custody, it still must provide due process by providing an explanation before changing previously agreed-upon schedules to see if those schedules are in the Children's best interest as well as the parents' best interest because often those interests coincide. In this case, the court just adopted Father's proposed order wholesale without explanation and did not explain why it found those arrangements were necessary to change the existing MSA custody schedules. Accordingly, we remand to the trial court to make findings as to why the vacation and summer schedule set forth in the MSA should not be followed and, if so found, to enter a new schedule.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judge Murray joins the memorandum.

Judge McLaughlin files a concurring/dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2023