J-S31003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| | : | |
| L.E.W. | : | |
| | : | |
| Appellant | : | No. 1048 EDA 2021 |

Appeal from the Order Entered April 15, 2021
in the Court of Common Pleas of Wayne County
Civil Division at No: Case No. 310-DR-2016

BEFORE: STABILE, J., KING, J. and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.: **FILED JANUARY 4, 2022**

L.E.W. ("Mother") appeals following the order of the Wayne County Court of Common Pleas (1) denying her request for sole physical custody of her son A.W. ("Child," born 2012); (2) denying her request to relocate to Florida with Child; and (3) awarding Child's father, A.N. ("Father"), supervised partial physical custody of Child under the directives of a mental health provider.

At the time of the order ruling on Father's petition for primary physical custody and Mother's petitions for sole physical custody and for relocation, Child had not seen Father since 2017, when he first alleged Father sexually abused him. After a three-day custody trial, the trial court found Mother did

---

[*] Retired Senior Judge assigned to the Superior Court.

not present competent evidence that Child was abused by Father. It directed a reunification process to begin despite prior attempts at the same and Child's mental distress and adamant position that he did not want to see Father. After review of this complicated case and consideration of our standard of review, we affirm the trial court's order.

The parties' dueling petitions at issue in this appeal were not filed until 2019 and 2020, but the following background is relevant to understand the evidence of the complex dynamics before the trial court at the custody trial. Mother and Father had a relationship for approximately two years prior to Child's birth in 2012. They never co-habitated nor married. Child is Father's only child, whereas Mother has five other children with her ex-husband, who lives in New York City but visits occasionally. N.T., 1/26/21, at 163-64. Child was born prematurely at 27 weeks and was hospitalized in the neo-natal intensive care unit for 74 days. *Id.* at Exhibit 5-6. Child has cerebral palsy, congenital heart disease that has required open heart surgery, and walks with a slight limp due to one leg being slightly shorter than his other leg. *Id.* It is undisputed that Mother has been Child's primary caregiver since birth.

Both parties live in the same housing community in Wayne County, Pennsylvania. During the first several years of Child's life, Father and Mother had no fixed or written custodial arrangement and arranged Father's custody informally. According to Father, he saw Child "a lot" for the first

three years of his life, except that he "wasn't allowed to come over" every other weekend when Mother's ex-husband was there visiting. *Id.* at 188. Father claimed Mother told him Child and her other children "couldn't mention [Father's] name or bring up anything about [Father]" around her ex-husband. *Id.* at 191. He separated from Mother when Child was three due to how Mother treated him when her ex-husband was in town. *Id.* at 189. In contrast, Mother asserted Father had little involvement in Child's life during his first three years, did not attend to his medical needs, and did not provide her support. *Id.* at 166-69.

On June 29, 2016, a little over a month before Child turned four years old, Father filed a custody complaint in Wayne County Court of Common Pleas averring that Mother had begun denying him visits. Father sought partial physical custody on alternating weekends and certain holidays.

Shortly thereafter, Mother instituted proceedings against Father pursuant to the Protection From Abuse ("PFA") Act, 23 Pa.C.S.A. §§ 6101-6122.[1] According to Mother, she filed this PFA because Father was coming into her house when she was not home trying to see Child and he

_____

[1] Although some of the facts are intertwined, the instant custody matter and the parties' PFA matters are separate matters under separate statutes and listed on separate dockets. As such, only the PFA documents admitted as exhibits in the custody matter are part of the certified record before us. The record does not reveal the exact date Mother filed a PFA petition against Father and the nature of the relief she obtained. Based upon the wording in the next series of custody orders discussed *infra*, it is apparent the court had entered an order restricting contact between Mother and Father.

threatened to kill Mother in front of her daughter. N.T., 1/26/21, at 173-75; N.T., 2/10/21, at 38. Following a custody conference before a reconciliation master, the trial court entered an interim order on August 9, 2016 in the custody matter and PFA matter modifying the PFA to permit Mother and Father to have certain contact regarding custody and allowing Father to visit with Child twice a week for eight hours each. Interim Order, 8/9/16, at 2-3.

On September 30, 2016, the parties stipulated that they would share legal custody, Mother would exercise primary physical custody, and Father would exercise partial physical custody to rotate on a two-week basis. Specifically, on week one, Father would exercise custody from Saturday mid-afternoon to Sunday late-afternoon. On week two, Father would exercise custody for an eight-hour period on Sundays. The parties also further modified the PFA order to allow more contact related to the exercise of their shared legal and physical custody. *See generally* Stipulated Order, 9/30/16.

Father asserted that during his first visit with Child pursuant to the custody order, Child told him that he had "a new daddy" and pointed towards Mother's house. N.T., 1/26/21, at 212. Father was concerned about Mother's ex-husband because Mother has told him about incidents in the past where her ex-husband was violent. *Id.* at 217. Mother admitted she and her ex-husband had "an issue" years ago, which prompted her to obtain a restraining order against him, but they have since gone to therapy

and raised their five children. *Id.* at 171, 178. Mother denied that she told Child to call her ex-husband dad or that her ex-husband lived with her; she claimed he visits their teenage child on some weekends. *Id.* at 173, 178.

In June 2017, when Child was just shy of five years old, Father took Child to a NASCAR car race during one of his custodial periods. Father's sister had secured access to the pit area for Child through her work and from Father's perspective, Child, a car-lover, "really had the time of his life." *Id.* at 201. Father claimed when he went to pick Child up the next day, Mother said Child could not go because he "is saying stuff." *Id.* at 202. Father was "blindsided." *Id.* Mother "seemed nervous" and Child ran out and said, "don't let daddy go." *Id.*

According to Mother, on Wednesday, June 21, 2017, Child was "touching himself" while Mother was changing him for bed. N.T., 1/26/21, at Exhibit A (PFA Petition, 6/26/17, at 2). When Mother asked him why he was touching himself, Child replied, "'[Father's first name] does this to me.'" *Id.* Child told Mother "[Father's first name] put his pee pee in his butt and rubs it on him and puts juice on their pee pee's [*sic*]" and "'it gets higher and higher.'" *Id.*

Mother reported the allegations to the Pennsylvania State Police, and Trooper Sharon Palmer began an investigation. N.T., 1/26/21, at 6. Trooper Sharon Palmer reported the allegations to Wayne County Children and Youth Services ("WCC&YS"), filed a Childline report, and arranged for

Child to undergo a forensic interview and physical examination at Scranton Child Advocacy Center. *Id.* at 9. On June 26, 2017, Mother filed a PFA petition seeking temporary relief on behalf of Child based on the allegations. Per Mother, after Child made the disclosures, Child started wetting the bed, having "terrible nightmares," and trouble sleeping. N.T., 2/10/21, at 21-22.

During Trooper Palmer's interviews of Child, Trooper Palmer observed that Child had a flat demeanor and showed no emotion, fear, sadness, awkwardness, or unwillingness to speak when describing the abuse to her. N.T., 1/26/21, at 10. Child told her Father "put sticky stuff … on his peepee and heiny," Father's mustache hurt him, a toy dolphin touched his "butt," Father "sat in the house naked," and Father showed Child nude photographs on the computer. *Id.* at 9-10, 30. Child's demeanor and manner of speaking about the abuse was unusual to Trooper Palmer; his physical reactions did not match the disclosures he was providing. *Id.* at 23. In her experience, victims tend to "shy away" from questions about the abuse. *Id.* at 30. In contrast, Child "blurted [it] out." *Id.* Significantly, Child was not able to articulate or provide information in response to follow up questions about what happened to him before and after the abuse. *Id.* at 23-24, 30-31. Several times he indicated he wanted to see Father but then backtracked. *Id.* at 23.

Trooper Palmer acknowledged that Child consistently maintained that Father abused him and she found Mother's concerns about the abuse to be

legitimate. *Id.* at 26, 30. However, Trooper Palmer had "light concern" that Mother was telling Child what to say. *Id.* at 33. During her investigation, Trooper Palmer showed Child a photograph of a van that resembled the van owned by Father. Although Mother had told Trooper Palmer that "every time [Child] would see the type of vehicle that [Father] drove [Child] would become panicked and fearful" and have a "meltdown," Child had no reaction. *Id.* at 37, 42. Additionally, the police investigation revealed Father had no internet access, computer, smart phone, or other ability to view electronic pornographic materials in his house at the time. *Id.* at 12. Furthermore, she found Father to be forthcoming in assisting the investigation, but Mother stopped cooperating. *Id.* at 24.

For example, Trooper Palmer attempted to interview Mother's ex-husband and Mother's adult son about the allegations, but she was not able to locate them. *Id.* at 23, 34. Child told Trooper Palmer that "he was no longer allowed to call [Father] daddy when [Mother's ex-husband] was around" and called Mother's ex-husband daddy instead. *Id.* at 25, 39. Child always referred to Father by his first name when making disclosures to Trooper Palmer. *Id.* at 25.

Trooper Palmer took the unusual step of asking Mother to take a polygraph test, but Mother said she wanted to talk to her lawyer and stopped returning Trooper Palmer's phone calls. *Id.* at 21. Trooper Palmer does not customarily ask a reporting parent to take such a test, but she was

concerned that Mother was "not being truthful." *Id.* at 39-40. Father, on the other hand, submitted to a polygraph at Trooper Palmer's request. *Id.* at 16, 19-20.

Father underwent a psychosexual evaluation with Lori Feneck, a therapist at Forensic Counseling Associates, on July 6, 2017. N.T., 1/26/21, at 58, Exhibit B. During Feneck's interview of him, Father denied touching Child in a sexual manner. *Id.* at 50. Based on the timing of the allegations, which closely followed the NASCAR race, Father theorized that Child may have been talking about Father and the good time they had in front of Mother's ex-husband, which caused Mother or her ex-husband to instruct Child to fabricate the allegations. N.T., 1/26/21, at 63-66.

As part of her evaluation, Feneck reviewed the PFA filed by Mother, the police report, and reports from Children and Youth. *Id.* at 60. Feneck detected no areas of concern in her assessment of his current mental status or his history regarding mental health, medical health, use of drugs and alcohol, and commission of crimes. *Id.* at 57-58, 82. She also conducted various risk assessments and concluded he was at low risk to commit a sexual offense in the future. *Id.*

On September 13, 2017, Father filed a petition for modification of custody seeking supervised visits. Father maintained his innocence and averred he had concerns Child was being "coached." Petition for Modification, 9/13/17, at ¶¶ 10, 12.

Also in September 2017, Father submitted to a polygraph examination. He had taken one in July 2017 that had inconclusive results, but the September examination did not indicate any deception. N.T., 1/26/21, at 61-62, 82. Father submitted to another polygraph examination in November 2017 with the Pennsylvania State Police, which also did not indicate any deception. *Id.* at 61-62, 82. Feneck updated her recommendation to indicate that she did not recommend any treatment for Father and concluded he did not abuse Child. *Id.* at 61-62, 82, Exhibit C.

Meanwhile, Mother sought assistance with Child's declining mental health. On July 27, 2017, Bridget Browning Mickere, a psychologist at KidsPeace, evaluated Child, then age five, and diagnosed him with Post-Traumatic Stress Disorder, Child Sexual Abuse of Suspected Subsequent Encounter, and Cerebral Palsy. *Id.* at 131, Exhibit 5. At the time of Dr. Browning Mickere's evaluation, Child was "demonstrating regressive behaviors," such as sucking his thumb and wetting the bed at night, wetting during the day, and speaking in baby talk. He also was rubbing his baby blanket on his forehead until it bled, demonstrating angry outbursts, was fearful and anxious, did not want to leave Mother's side, and verbalized a fear of Father. *Id.* at Exhibit 5-6. During his interview with Dr. Browning Mickere, Child reported feeling safe with Mother but not Father. Child "was open and talked freely" about his allegations regarding Father. *Id.* at Exhibit 5-7.

Dr. Browning Mickere believed that Child experienced sexual abuse based on the symptoms suggesting he has been traumatized, including his fear, regressive symptoms, self-harming behaviors, recurring nightmares, avoidance of Father, angry outbursts, hypervigilance, and sleep disorders. *Id.* at Exhibit 5-8. She recommended that he treat with KidsPeace's Sexual Issues and Treatment Education ("SITE") Program, which offered individualized counseling to children who had been sexually abused or were sexual perpetrators. *Id.* at 127, Exhibit 5-10. She also recommended he not visit with Father, concluding that "[d]ue that the severity of his symptoms, it is in his best interest to begin therapy and be allowed time to reconcile his symptoms in an environment that feels safe to him. In time his therapist can make the recommendation to begin visits based on clinical progress." *Id.* at Exhibit 5-10.

Accordingly, Child began treatment with therapist Kim Rosencrans. Rosencrans testified at trial that she began working with Child after WCC&YS referred him to their program and continued until 2018, meeting with him two to three times a week in Mother's home and at school, both alone and with Mother. N.T., 12/26/21, at 128, 141.

During her sessions with him, Child always called Father by his first name. Child told Rosencrans that Father touched his "peepee" and "butt," Father inserted "things into his butt," Father used items that would "shake," and Father put his mouth on his "peepee" and Father's mustache tickled.

- 10 -

*Id.* at 134. Child made these statements to Rosecrans in and out of the presence of Mother, sometimes at home and sometimes at school. *Id.* at 135.

When Father was mentioned, Child would "become very upset." *Id.* Sometimes Child would cry or even sob uncontrollably. *Id.* at 135-36. Child sometimes became angry with the person who mentioned Father or "would become aggressive and say I got to get something because I'm going to hit him or shoot him or throw this at him." *Id.* Child "would become very scared, very nervous, sometimes he would look to almost hide from whatever he believed might happen," such as Father walking into the room or driving past his home or school. *Id.*; *see also id.* at Exhibit 5-35 (progress report noting Child gets upset at unexplained bumps or creaks). Rosencrans observed that when Father drove past his house, Child would cry, yell, get anxious, or become very upset. *Id.* at 136; *see also id.* at 5-35 (progress report noting Child ran and hid when he saw a blue van go past, and screamed, "it's [Father's]").

In the progress reports authored by Rosencrans, she noted Child's expressed fear that Father would hurt him or Mother because he disclosed the abuse; Child told her "[Father] told me he will hurt me or mommy or the puppies if I told." *Id.* at Exhibit 5-36. Child was also afraid to go outside, school, or the store for fear of Father coming and taking him away. *Id.* at Exhibit 5-35. Child often spoke of an imaginary friend named Lottie who

- 11 -

made him do bad things but also protected him. Lottie was often aggressive and angry, and Child told Rosencrans the same things Father did to him happened to Lottie. *Id.*

Throughout the sessions, Rosencrans's notes indicated Child continued to struggle with anxiety, aggression. *See, e.g.*, *id.* at Exhibit 5-50, 5-65. For example, in late 2017, Child urinated on a little girl while they were playing at Mother's house unsupervised. *Id.* at Exhibit 5-61. Rosencrans concurred with the psychologist's recommendation that he have no contact with Father at that time. *Id.* at 139. She did not notice any signs that Child was being coached, such as looking for Mother's approval or asking her if he got it right. *Id.* at 140. However, Rosencrans posited that some of Child's manipulative and defiant behaviors may be due to Mother's parenting style. *Id.* at 150, Exhibit 5-50, Exhibit 5-61, Exhibit 5-81.

In addition to the SITE program, Mother also sought psychiatric help for Child. Scranton Counseling Center first saw Child in October 2017. At that time, Child expressed worry that Father would hurt him or Mother; Child wet the bed, threw up and had frequent headaches, refused to sleep alone, frequently checked to ensure the front door was locked, and was "borderline obsessive" about wanting a certain watch because he believed the watch would protect him by shooting fire. *Id.* at Exhibit 4-38. Most significantly, Child had been hearing a female voice who growls when she "takes over" and displays anger and aggression, as well as other "nicer" voices. *Id.* Dr.

Edward Lee diagnosed Child with Post-Traumatic Stress Disorder and prescribed an anti-anxiety medication on October 18, 2017, to assist with Child's anxiety at bedtime. *Id.* at Exhibit 4-4.

On January 2, 2018, the trial court entered an order based upon stipulations agreed upon by the parties. The order indicated, *inter alia*, that the court would appoint a guardian *ad litem* to represent Child's best interests,[2] that the parties would arrange for a counselor to begin working with Child, and that visits between Father and Child could begin at the counselor's discretion and under terms approved by the counselor. The parties agreed the trial court should not schedule a review because they anticipated that counseling could take many months before there was "movement," and that either party could petition the court for a review conference as appropriate. Stipulation and Order, 1/2/18, at ¶ 5.

Shortly thereafter, on January 19, 2018, the court entered another order based upon stipulations agreed upon by the parties. This time the

_____

[2] The trial court appointed Leatrice Anderson, Esquire, as Child's guardian *ad litem*. Attorney Anderson filed several reports, as well as motioning for a custody evaluation, the request for which the trial court denied. On November 2, 2020, prior to the hearings at issue in this appeal, Attorney Anderson filed a motion to withdraw, citing the demands of her private law practice. Mother opposed the request, but Father was in agreement. The trial court granted the motion to withdraw on October 3, 2020. The trial court permitted either party to request appointment of a new guardian *ad litem*, but neither did.

parties agreed that Father shall have no contact until further order of court. Stipulation and Order, 1/19/18, at ¶ 2.

Child continued to work with the KidsPeace SITE program. In early 2018, Child disclosed additional information to KidsPeace, indicating that Father would play a Paw Patrol television episode over and over while touching his "peepee." N.T., 1/26/21, at Exhibit 5-79. He also alleged Father took him into a basement where a dog was locked in a cage without food and water; the dog was trying to get out to save him from Father. *Id.* Child said Father removed their pants and put "stickies" on his "peepee" and "candy" that was a "pop" in his "butt." *Id.*

In May 2018, Marcia Coranata, an independent licensed social worker, authored a letter summarizing several sessions she had with the family.[3] In the letter she indicated that she had interviewed Father, reviewed Child's evaluations by KidsPeace and Father's evaluations by Feneck, and had sessions with Child. According to the letter, Child told Coranata that "[Father's first name] had done bad things to him, put sticky stuff on his butt and penis, and that [Father's first name] is a bad man." N.T., 1/27/21, at Exhibit E. Child's affect was the same during these disclosures as it was when speaking about benign topics such as play, school, and Mother. *Id.*

---

[3] Neither party called Coranata to testify at trial; they stipulated to her letter in lieu of her testimony. The record provides no background as to how or why Coranata began working with the family, or the dates of her sessions.

During the next session, Child stated unprompted that he did not want to see Father because he does bad things and told Coronata to let Mother know "he did a good job in telling me." *Id.* Coronata stated due to Child's desire not to see Father, therapeutically she could not recommend sessions to occur, but she believed the relationship between Child and Father should "be explored as there are inconsistencies with [Child] being traumatized by [Father]." *Id.* She recommended that another third-party therapist assess Child and his reports to provide an additional opinion. *Id.*

On May 10, 2018, Father filed another petition to modify custody. This time, he sought to reinstate his partial physical custody of the Child. He noted his concerns about coaching again, and averred that there were no criminal matters, children and youth matters, or protection from abuse matters precluding him from having contact with Child. Father's Petition for Modification of Custody, 5/10/18, at ¶ 10. Specifically, he averred that (1) after being continued a number of times due to ongoing criminal and WCC&YS investigations, the June 26, 2017 temporary PFA order expired in January 2018; (2) although WCC&YS initially indicated the report of child abuse, following an expungement hearing before the Pennsylvania Department of Human Services ("DHS"), such finding was expunged;[4] and

_____

[4] Father later sought to admit the findings of fact from the expunction hearing at the custody trial, but Mother objected and the trial court sustained her objection. N.T., 1/26/21, at 252. Instead, the parties
*(Footnote Continued Next Page)*

(3) he underwent a forensic sexual assessment with a polygraph component with positive results in his favor. *Id.* at ¶¶ 7-9, 11.

The parties appeared before a master for a custody hearing on August 2, 2018, and reached an interim stipulation regarding the matter in lieu of the hearing. The court entered the terms of the stipulation as an order on August 10, 2018. *Inter alia*, the parties agreed that Child should cease his counseling services through KidsPeace and begin counseling with a private licensed professional counselor, Sara Wentz, instead. The parties desired Wentz "to assess whether or not reunification with Father is something that is feasible or can be implemented into a treatment plan." Interim Stipulation and Order, 8/10/18, at ¶ 4. The parties agreed that Wentz had the sole discretion to conduct the therapy at the frequency and with the participants and recommendations as she sees fit. *Id.* at ¶ 7. Once again, the parties declined to set a review because they anticipated that counseling could take many months. *Id.* at ¶ 8.

Thus, Child's therapy with KidsPeace ended on July 27, 2018. In Rosencrans's opinion, Child made only slight improvement during her time with him. N.T., 1/26/21, at 161; *see also id.* at Exhibit 5-70 (1/30/18

*(Footnote Continued)* ───────────────

stipulated that WCCY&S made an indicated finding of child abuse against Father, which was later expunged following hearings before DHS. *Id.* Additionally, Trooper Palmer explained that Child testified during the DHS expunction hearing, but he "wasn't able to answer their questions in a manner that showed that he had, in fact, been sexually abused." *Id.* at 24.

service plan indicating Child's behaviors have deteriorated over the past six months); *id.* at Exhibit 5-81 (6/5/18 report indicating Child was making "slow progress"); *id.* at Exhibit 5-84 (6/22/18 Psychological Evaluation indicating Child's prognosis is fair and he may show progress with continued intensive services); *id.* at Exhibit 5-90 (7/12/18 service plan indicating Child's progress is slow, which "may be due to his young age, PTSDE[,] or parent not following through with therapeutic suggestions that could assist him;" also noting reduced reliance on imaginary friends and self-harm but continued nightmares, feeling unsafe despite locked windows and cameras around the home, attempts to injure family members, and yelling for attention).

A few months after Child began counseling with Wentz, on November 14, 2018, a psychiatrist at Scranton Medical Center, Dr. Cyril Puhalla, updated Child's diagnosis to unspecified Psychotic Disorder with a rule out of unspecified Bipolar with psychosis and Post-Traumatic Stress Disorder severe. N.T., 1/26/21, at Exhibit 4-27. Dr. Puhalla prescribed an anti-psychotic medication for "psychotic symptoms, paranoia, hallucinations, self[-]destructive behavior, mood instability, rage, depression, and pervasive anxiety, to prevent further self and other destructive behavior and regression to point of needing psychiatric hospitalization." *Id.* at Exhibit 4-27. Child was continuing to hear voices and Dr. Puhalla believed the medication was needed to control Child's hallucinations. Initially, Mother's

compliance with consistent administration of the anti-psychotic medication to Child was inconsistent, but she eventually began giving it to him regularly. *Id.* at Exhibit 4-48. Once he took it regularly, Child was calmer with less anxiety, but still got anxious with loud noises. *Id.* Mother stopped giving Child the anti-psychotic medication when Child began experiencing physical side effects. Dr. Puhalla prescribed an anti-anxiety medication and reduced the anti-psychotic medication to be taken as needed. *Id.* at Exhibit 4-52.

At an August 27, 2019 medication check, Mother reported to Dr. Puhalla that Father drove by their house frequently, and Child had begun eating his finger out of anxiety and was still hearing voices. Dr. Puhalla wrote, "[i]f true that [Father] is still showing up to scare [Child] it is unlikely the voices will go away until [Father] goes away and is not a threat anymore." *Id.* at Exhibit 4-62.

Meanwhile, Wentz, the counselor jointly selected by Mother and Father to conduct reunification therapy, worked with Child from mid-2018 through mid-2019, in his home, at school, and in her office. She never had a session with Child and Father. In a letter summarizing the therapy, Wentz stated there was "never any movement of reunification effort as [Child] was visibly anxious when the topic was broached." N.T., 2/20/21, at Exhibit 6.[5] From Mother's perspective, reunification did not happen during Wentz's

_____

[5] Neither party called Wentz to testify at trial; they stipulated to her letter in lieu of her testimony.

- 18 -

reunification therapy with Child because Wentz thought Child should confront his fear but wanted to leave it up to Child. *Id.* at 105.

In August 2019, Child began seeing Dr. John Gibbons, a mental health practitioner who has a doctorate in social work, is licensed in social work and family therapy, and specializes in working with children with trauma. N.T., 1/26/19, at 89-90. He saw Child in his office one to three times a month, but the visits ultimately moved to the telephone once the COVID-19 pandemic began in March 2020. *Id.* at 92, 103. Dr. Gibbons reviewed reports by Child's previous clinicians. *Id.* at 108. He did not review any of Father's forensic evaluations. *Id.* He attempted to obtain reports from WCC&YS and the Children's Advocacy Center, but he was not able to obtain them. *Id.*

Like previous practitioners, Dr. Gibbons diagnosed Child with Post-Traumatic Stress Disorder. *Id.* at 99-100. Child was very anxious and vigilant, showed dissociative phenomena, and needed to have Mother around due to his hypervigilance. *Id.* at 93. Child's dissociative phenomena included referring to "bad [Child's first name]," particularly when he engaged in certain behaviors such as putting a nail in the coffee cop of a woman who lived with Mother for a time. *Id.* at 98. Child made disclosures to him such as being in a basement with a dog and Father who put his mustache on his "peepee." *Id.* He also had been "acting out sexually" with his half-sister's

boyfriend, which is a "common symptom of children who have been sexually abused, especially boys." *Id.* at Exhibit 8.

Also in August 2019, Father filed the petition at issue in this appeal. Initially, Father sought to modify custody to reinstate his partial physical custody. He noted the reunification therapy with Wentz had ceased without any effort to reunify him with Child. *See* Father's Petition to Modify Custody, 8/28/19, at ¶¶ 6-9. On December 19, 2019, Father amended his petition to add his request to obtain primary physical custody of Child. Father's Amended Petition to Modify Custody, 12/19/19, at ¶ 7.

In response, Mother filed an answer to Father's petition to modify custody and a counter-petition for sole legal and physical custody of Child. Mother requested that that the no-contact order remain in place, averring that reunification therapy has not progressed due to Child's "extreme anxiety in response to the subject to being in [Father's] presence." Mother's Answer and Counter-Petition, 8/3/20, at ¶ 18. Mother also filed a petition to relocate, wherein she sought to move to Florida with Child to be near her parents and adult son. Mother's Petition for Modification of Custody on Relocation, 8/12/20. In addition to being near family, Mother sought to move to "start over in a new, fresh environment away from the existing area where [Child] was traumatized by [Father]." Notice of Proposed Relocation, 8/12/20, at 2. In response, Father filed an answer to Mother's counter-

petition seeking sole custody, objected to the relocation, and demanded a hearing.

After a series of continuances, the case proceeded to hearings before the trial court on January 26 and 27, and February 10, 2021. Father presented his own testimony, as well as the testimony of Trooper Palmer and Child's paternal aunt. He also presented the expert testimony of Feneck regarding the forensic sexual evaluation she conducted. Mother presented her own testimony, as well as the testimony of Rosencrans, one of Child's therapists from KidsPeace. Mother also presented the testimony of Dr. Gibbons, who was still treating Child at the time of the hearing. Per the agreement of the parties, the trial court conducted an *in camera* testimony of Child without the presence of the parties and counsel, and the court sealed the record.

In addition to testimony consistent with the discussion above, *inter alia*, the trial court received the following information. According to Trooper Palmer, the multi-disciplinary team of law enforcement and child protective services workers assigned to the case "felt that there was possibility of this not happening to [Child] the way it was reported," although they could not rule out that it did. N.T., 1/26/21, at 41-42. Trooper Palmer decided she would not file criminal charges against Father based upon Child's presentation during interviews, Mother's change in cooperation with the investigation, Father's continual cooperation with the investigation, the

- 21 -

inability to interview Mother's ex-husband and adult son, and Child's testimony during the DHS expunction hearing. *Id.* at 23-24.

During his testimony, Dr. Gibbons emphasized that all the records from Child's various clinicians "converge on the same diagnosis with similar reports and findings" and he does not think another evaluation is clinically indicated. *Id.* at 106. In these types of case, Dr. Gibbons looks for certain types of language, presentations, and consistency of stories over time, and he did not believe that Child had been coached by anyone regarding the allegations. *Id.* at 107. Child had never accused anyone else of sexual molestation to him and has been consistent in his allegations and feelings regarding Father. *Id.* at 108. Dr. Gibbons has observed Child get very angry and anxious when speaking about Father, so he thought it was odd that others have reported Child's lack of emotion when he discussed the abuse. *Id.* at 110.

In the opinion of Dr. Gibbons, if Child is forced into visitation with Father, Child will experience a "regression across the board with him including some self-injurious behavior, aggression, [and] hypervigilance," and it is not in Child's "best interest to be in the presence of [Father]." *Id.* at 102. *See also id.* at Exhibit 8 ("[A]ny order that forces [Child] to have visits with … Father would result in a potential abreaction and behavioral regression that would be a tremendous clinical setback for this young man who already shows with multiple emotional and physical compromises.").

Based on his conversations with Child and Mother when Child was visiting Florida recently, Child was "less anxious," "goes outside without trepidation," and "per [Mother's] words he's like a different child." *Id.* at 103. Dr. Gibbons concurred with the initial recommendation of Dr. Browning Mickere for Child to have no contact with Father, even supervised, "given the history of this case, the length of time involved, and [Child's] current emotional presentation." *Id.* at 105-06. Dr. Gibbons also believed Child's current living situation in the proximity of Father and Father's relatives created ongoing anxiety, and Mother should be able to move with Child to Florida. *Id.* at 106.

During his testimony, Father maintained his position that he did not own a computer or have access to the internet in 2017, and denied abusing Child in any fashion. *Id.* at 207-10. Father expressed his concerns about Mother's ex-husband. Father does not believe Mother's denial that her ex-husband is not living there; since the pandemic started, he sees her ex-husband's car when he passes her house almost every day and sees him doing things like mowing the grass, walking the dogs, or driving with Mother. *Id.* at 218. Father opposed Mother's relocation because he wants to re-establish a relationship with Child, with whom he has not seen in three years due to the ongoing custody litigation. *Id.* at 249.

Mother denied that her ex-husband lives with her and continued to insist that he visits occasionally. She currently lives with Child, her teenage

child she shares with her ex-husband, and a female friend. *Id.* at 164. She opposes Child having contact with Father based on Child's anxiety and Child's position that he "is absolutely against it." *Id.* at 179. In addition to the proximity to family and their support, Mother wants to move to Florida because Father's sisters live next door and Father lives up the street and they "are constantly harassed." N.T., 2/10/21, at 58, 64-71. Mother claimed Father "drives by every single day" and Child continually saw Father's van. *Id.* Child could not play outside because he gets nervous and has anxiety, and Mother did not think it was healthy for him. *Id.*

Finally, at the time of the hearing, Child was prescribed one medication each for anxiety and bedwetting. *Id.* at 29. Child took both medications only as needed; Child had not taken the anxiety medication in the last couple of months because Mother and his psychiatrist agreed she could try to reduce it. *Id.* at 102-03. Child had not taken the enuresis medication in two months; since Mother and Child visited Florida over the holidays, Child did not need it. *Id.* at 101.

Following the conclusion of testimony, the trial court held its decision in abeyance while it considered all items in the record. On April 1, 2021, the trial court issued an opinion and order, denying Mother's petition to relocate and modifying the parties' custody arrangement as follows. It awarded shared legal custody to both parties, partial physical custody to Mother, and partial supervised physical custody to Father under the directives of a

mental health provider. The trial court ordered both parties to agree upon a mental health provider and arrange "to begin the therapeutic reunification process between Father and [Child]." Opinion and Order, 4/1/21, at 23. The trial court permitted the therapist to set the logistics of the appointments, such as the frequency and persons eligible to attend, and ordered the parties to abide by the therapist's directives. *Id.* The trial court directed the therapist to provide monthly reports to the court and the parties. *Id.* at 24. The court ordered Mother to refrain from asking Child about the sessions. *Id.* Finally, the court scheduled a "review hearing" for September 7, 2021. *Id.*

In support of its order, the trial court analyzed the custody and relocation factors, but assessed the case as "hing[ing] upon an allegation of sexual abuse made by [Child] approximately four … years ago that Father sexually abused [Child]." *Id.* at 17. The court concluded that Child believes Father did "bad things" to him, but it did not receive competent evidence that proves the allegations are true and believes Father would do whatever is required to be able to have a relationship with Child. *Id.* at 22.

The trial court expressed a desire to protect Child's safety and best interests in the event the allegations are true and concluded that "[i]n a therapeutic setting, with supervision, [Child] can be protected and safe and still explore reunification with Father." *Id.* It indicated Mother needed to continue her "consistent willingness to comply with medical, legal and law

- 25 -

enforcement advice for the best interests of [Child]" and "encourage [Child] in this process and support it." *Id.* It concluded by stating its belief that "it would be harmful for [Child] to continue to not have the opportunity to engage in therapy with his father." *Id.*

Mother then filed the instant appeal and contemporaneously filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a). Mother then sought a stay of the trial court's order while the matter was on appeal in accordance with Pa.R.A.P. 1701(b)(1). Father filed an answer. The trial court conducted a hearing on June 4, 2021, wherein Mother and Dr. Gibbons testified in support of Mother's application for stay. The trial court denied the application on June 7, 2021, finding that it was in Child's best interest to begin reunification. Mother also sought a stay of the trial court's order from this Court, but her application was denied on August 10, 2021.

On appeal, Mother presents the following issues.

I.   Did the trial court abuse its discretion and ere [*sic*] as a matter of law in finding that granting Father supervised partial physical custody in the context of forced reunification therapy is in Child's best interest?

   A. Did the trial court ere [*sic*] as a matter of law in using an inappropriate standard (beyond a reasonable doubt) and abuse its discretion in relying on the testimony and psychosexual evaluation of Laurie Feneck offered by Father and the testimony and opinion of Trooper Sharon Palmer regarding Child's allegations over those of his mental health providers?

B. Did the trial court ere [*sic*] and abuse its discretion in holding Mother's attempts to protect Child from abuse against her?

C. Did the trial court ere [*sic*] and abuse its discretion in finding that reunification is in Child's best interest based on its determination that Father may not be guilty when his mental health providers recommend no contact?

II. Did the trial court abuse its discretion and ere [*sic*] as a matter of law in finding that Mother's proposed relocation is not in Child's best interests pursuant to the factors at 23 Pa.C.S. § 5337(h) and where the relocation would not prevent the Order for partial custody supervised at the discretion of a licensed mental health provider to be fulfilled?

Mother's Brief at 6-7 (party designations altered).

Before we address the issues presented by Mother, we consider whether we have jurisdiction to review the trial court's orders. "Since we lack jurisdiction over an unappealable order it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order." **S.C.B. v. J.S.B.**, 218 A.3d 905, 912-13 (Pa. Super. 2019) (citation and quotation marks omitted). "Few legal principles are as well settled as that an appeal properly lies only from a final order unless otherwise permitted by rule or statute." **G.B. v. M.M.B.**, 670 A.2d 714, 717 (Pa. Super. 1996). A child custody order is final and appealable "only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties." **Id.**

Initially, this Court ordered Mother to show cause as to the finality or appealability of the April 1, 2021 order, observing that the finality of the order was unclear because the trial court scheduled another hearing in the same order. After reviewing Mother's response, this Court discharged the rule to show cause, but indicated that this panel may revisit the issue.

Upon review, we are satisfied that the April 1, 2021 order is final and appealable pursuant to Pa.R.A.P. 341 notwithstanding the anticipation of a review hearing three months later. The trial court issued the April 1, 2021 opinion and order after conducting full evidentiary hearings on the parties' dueling modification petitions and Mother's relocation petition and considering the required statutory factors. It is apparent that the April 1, 2021 order constituted the trial court's final decision at that point in time on Child's best interests regarding division of custody and residence. The court scheduled the review hearing merely to review the implementation of the court's decision. Accordingly, Mother's appeal is properly before us. **See K.D. v. E.D.**, __ A.3d __, 2021 WL 5314731, at *4 (Pa. Super. Nov. 16, 2021 (concluding custody order providing for therapeutic supervised partial physical custody was a final order, and scheduled review hearing did not defeat finality because it was intended "to hone the court-ordered therapeutic process and confirm the parties' participation").

We turn to the two issues presented by Mother. In considering those issues, we bear the following in mind. The standard of review of an order

requiring therapeutic supervised partial custody is the same as that for any other custody order. **K.D.**, **supra** at *11.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**S.C.B.**, 218 A.3d at 913-14 (citation omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors that trial courts must consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a):

> (a) Factors.--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

- 29 -

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

When a custodial party seeks to relocate a child's residence, the party must petition the court, and the court must consider the relocation factors of subsection 5337(h).  **D.K.D. v. A.L.C.**, 141 A.3d 566, 572-73 (Pa. Super. 2016) (citing 23 Pa.C.S.A. § 5337(h)).  The subsection 5337(h) factors are as follows:

(h) Relocation factors.—In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

As the custodial parent seeking to relocate with Child, Mother had the burden of establishing that relocation is in Child's best interest. *See* 23 Pa.C.S.A. § 5337(i)(1) ("Burden of proof.—(1) The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h)."). There is overlap between the relocation factors set forth in subsection 5337(h) and the custody factors set forth in subsection 5328(a). *D.K.D.*, 141 A.3d at 572. The trial court should consider the two issues together "under a single umbrella of best interests of the children." *Id.* (quoting *S.J.S. v. M.J.S.*, 76 A.3d 541, 550 (Pa. Super. 2013)).

Mother's issues challenge the trial court's decision to award Father supervised partial physical custody under the direction of a therapist instead

of permitting Mother to exercise sole physical custody and to move with Child to Florida. Specifically, Mother argues the trial court abused its discretion by relying on Trooper Palmer's testimony that Child's flat demeanor and openness about his allegations indicated to her that Child was not being truthful. Mother's Brief at 16. In Mother's view, Child's mental health providers have mental health training and expertise, and they describe a very different presentation of Child when he is in a therapeutic setting. *Id.* Mother argues Child's allegations have too many details and Child's emotional reactions are too strong for the allegations to be fabricated. *Id.* at 23. Mother emphasizes the extreme nature of the symptoms, the symptoms specific to sexual abuse victims, and the consistency in Child's focus upon Father as the perpetrator. *Id.* at 24. Mother notes that Child's position has been more than a mere preference; instead Child has been adamant and multiple mental health providers agree that Child has an extreme emotional reaction regarding Father. *Id.* at 29.

Mother also contends the trial court held her efforts to protect Child against her, when Mother has cooperated with professional recommendations. *Id.* at 32. Mother notes that Father did not present any evidence contradicting Child's mental health experiences and believes the trial court substituted its lay opinion in lieu of the professionals who believe contact with Father would be extremely harmful. *Id.* at 33-34, 37. Finally, Mother believes the trial court abused its discretion in finding that Child's

"highly unlikely future relationship with [Father] outweighs the benefit to [Child's] development from the proposed relocation." *Id.* at 43.

In making her arguments, Mother goes through each of the custody and relocation factors and argues most of the factors the trial court found to be neutral or in favor of Father should have been found to be in her favor instead. But the crux of Mother's arguments stem from the same notion: that the trial court abused its discretion by determining that Father likely did not sexually abuse Child despite Child's consistent position that Father abused him when he was almost five years old. Moreover, Mother argues the trial court exceeded its discretion by forcing Child to see Father despite Child's adamant desire not to have contact and uncontroverted evidence from Child's mental health providers that Child experienced trauma and believes Father to be the source of the trauma.

Upon review, it is obvious that the trial court was faced with a difficult dilemma. It was presented with some witnesses who believed Child fabricated the allegations of abuse at the urging of an adult, and some witnesses who believed Child was telling the truth. The trial court heard from those witnesses firsthand, as well as Mother, Father, and Child, and assessed their credibility in person. The court was not persuaded that Father abused Child, particularly from Trooper Palmer's testimony. Trial Court Opinion and Order, 4/1/21, at 13. The trial court also emphasized Father's lack of computer and internet access, his forthcoming cooperation in

the investigation, DHS's overturning of the indicated finding of child abuse, and Feneck's opinion that Father did not need treatment for any sexual issues. *Id.* at 13, 17.

Some of Mother's arguments have appeal, but as we explained above, it is within the discretion of the trial court to make determinations of weight of the evidence and credibility. *V.B.,* 55 A.3d at 1197. "Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006). Moreover, "it is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party." *E.B. v. D.B.*, 209 A.3d 451, 469 (Pa. Super. 2019) (quoting *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005)). As the trial court's determination that Father may not have abused Child has support in the record, we discern no abuse of discretion in this determination.

Of concern, however, is Child's mental health, Child's firm belief that it was Father who abused him, and the testimony from Child's mental health practitioners that Child would experience harm if he had contact with Father. The trial court credited Dr. Gibbons's testimony that Child suffers from Post-

Traumatic Stress Disorder and anxiety, Trial Court Opinion, 4/1/21, at 18, but apparently did not accept his opinion that maintaining no contact with Father would alleviate Child's conditions. "[W]hile a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record." *M.A.T. v. G.S.T.*, 989 A.2d 11, 20 (Pa. Super. 2010) (*en banc*).

The trial court explained the basis for its decision as follows. While the trial court acknowledged that Child does not want to see Father, the trial court determined

> the allegation of abuse has been indoctrinated into [Child's] beliefs that Father did "bad things." This idea has been perpetuated by Mother's fear, therapist visits, and this litigation. This [c]ourt believes [Child] does not have his own well-reasoned preference as it relates to seeing … Father and thus his preference is being given limited weight in this custody determination.

Trial Court Opinion, 4/1/21, at 15.

The court found that Mother has not attempted to turn Father against Child, noting that she followed guidance and advice from mental health professionals and law enforcement and followed necessary safety measures for Child throughout the litigation. *Id.* The court also emphasized Mother's role as the primary caregiver of Child since birth and noted Mother has attended to Child's complex needs. *Id.* at 16. However, the trial court also

found that "Mother may be prolonging the conflict." *Id.* at 17. Similarly, the trial court found Mother makes co-parenting with Father "difficult for Father" because Mother's strong feelings about keeping Child apart from Father "resonate with [Child], and they inhibit the reunification process between Father and [Child]." *Id.* at 20. The trial court highlighted Mother's filing of a PFA against Father when he sought to modify custody as an example of her "animosity" against him that "resonates with [Child]." *Id.*

Although the trial court never made a finding as to who indoctrinated the allegations of abuse into Child, the trial court found the presence of Mother's ex-husband in her home "could potentially be inhibiting the reconciliation process with Father" and "could also confuse [Child] because [Child] has called [Mother's ex-husband] 'dad' in the past." *Id.* at 21. The trial court emphasized Mother's admission that her ex-husband abused her in the past and Father's testimony that he could not be around Child when Mother's ex-husband was in town. *Id.* at 21-22.

The court acknowledged Child's mental health difficulties but also pointed to testimony indicating that Child had a reduced need for anxiety medication and was doing well in school, at home, and with his current therapist, Dr. Gibbons. Moreover, it determined that there was

> no evidence to suggest that it would be harmful within a therapeutic setting for [Child] to see Father and re-establish their relationship. The record does not support a finding that

Father is so severely or morally deficient as to pose a grave threat to [Child's] welfare[6] if the relationship is re-established in a therapeutic setting and the eventual visitation is supervised by one of Father's sisters.

*Id.* at 17.

The trial court's finding that someone may have indoctrinated Child's beliefs has support in the record from the testimony of Trooper Palmer, Father, and the letter from Marcia Coronata. N.T., 1/26/21, at 33 (Trooper Palmer's testifying she had light concern Child was coached); *id.* at 189-94, 201-07, 212, 216-221, 237 (Father's describing negative interactions with Mother's ex-husband, his observations that Mother's ex-husband is frequently present in her home, Child's statements about having a new

---

[6] Mother does not argue that the trial court used an incorrect standard of review. We observe that in places in its analysis, the trial court uses the term "grave threat" to assess whether it was in Child's best interests to grant Father partial custody under the supervision of a therapist. As the current Chief Justice Baer explained in a concurring opinion when he was a Justice, historically courts have often used terms like "grave threat of harm" to determine whether a parent should have contact with a child. *D.R.C. v. J.A.Z.*, 31 A.3d 677, 688 (Pa. 2011) (Then-Justice, now-Chief Justice Baer, concurring). However, he emphasized that amendments to the Child Custody Act "provide universally for the consideration of whether the parent poses a risk or threat of 'harm.'" *Id. citing* (23 Pa.C.S.A. § 5328 (entitled "Factors to consider when awarding custody" and providing that in ordering any form of custody, a court shall consider "whether there is a continued risk of harm to the child or an abused party")). In his view, "there is no need for any trial court to find a 'grave' threat of harm." *Id. But see K.D., supra* at *11 n.5 (acknowledging authority applying a "grave threat" standard predated the Child Custody Act, "which does not specifically establish the 'grave threat' standard," but concluding trial courts could consider a judicial doctrine such as "grave threat" under the catch-all provision of § 2328(a)(16)) (*citing M.J.M. v. M.L.G.*, 63 A.3d 331, 338 (Pa. Super. 2013)).

daddy, his inability to visit when Mother's ex-husband was in town, Child's inability to reference him in front of Mother's ex-husband, and the timing of the allegations following the NASCAR outing); N.T., 2/20/21, at Exhibit E (Coronata's noting Child's statement that he did not want to see Father and to let Mother know he did a good job in telling her).

Given that finding, it is not manifestly unreasonable for the trial court to have declined to follow Dr. Gibbons's recommendation, as the recommendation is premised upon Dr. Gibbons's belief that Father abused Child. Dr. Gibbons conceded during his testimony that he did not have access to all information. Furthermore, we note that Mother previously agreed to Child's attempted reunification with Father via therapy with Wentz at a time when Child's mental health was significantly worse. While Child still struggles with his mental health, the trial court's observation that his mental health is more stable is based upon the record. N.T., 2/10/21, at 102-03. According to Mother, Wentz opted to follow Child's lead on reunification. Considering the trial court's finding that Mother's animosity towards Father may influence Child, it is unsurprising that Child has been so steadfast in his desire not to see Father. **See K.D., supra** at *15 (observing certified record indicates "[the m]other's perspective in this protracted custody litigation is clouded by an unresolved conflict with [the f]ather" notwithstanding the lack a criminal or civil finding of abuse by the father and the father's attempts to change his lifestyle and eliminate other risk factors).

Based on the foregoing, it was not manifestly unreasonable for the trial court to have concluded that Child may do differently now that his mental health has stabilized a bit, alongside encouragement by Mother, a therapist with a different mindset, and review oversight by the trial court. We conclude that the trial court "did consider" Dr. Gibbons's opinion, but "it simply found that opinion unconvincing" given its other findings. *S.C.B.*, 218 A.3d at 917.

We decline to interfere with the trial court's judgment in a close case such as this one, as the trial court heard the witnesses firsthand. *S.C.B.*, 218 A.3d at 913-14 ("[W]ith regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand."). Moreover, because the trial court engaged in a thorough analysis of the custody factors pursuant to § 5328(a)(1)-(a)(16) and the relocation factors pursuant to § 5337(h)(1)-(h)(10), and there is support in the record for the trial court's decision, our standard of review dictates that we must affirm its order. *S.C.B.*, 218 A.3d at 913-14 ("We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court."); *K.D.*, *supra* at *11 ("Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion."). We are further cognizant that if the trial court's approach does not have its intended effect of helping Child heal, custody cases are always

subject to modification. *See* 23 Pa.C.S.A. § 5338(a) (permitting modification of a custody order upon petition "to serve the best interest of the child"). Accordingly, based on the record before us and our standard of review, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/4/2022